THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

CHRISTOPHER DICUGNO,

        Defendant.

No. CR 09-402 RAJ

**DEFENDANT DICUGNO'S
PRESENTENCE MEMORANDUM**

**I**

**OBJECTIONS TO PROBATION PRESENTENCE REPORT**

**Loss Calculation**

We object to Ms. McLuen's loss calculation of $1,162,867. We realize that this figure is based on figures provided to her by the Government without any real backup documents. On November 3, 2010, FBI Agent Salee provided undersigned counsel with 22 pages of documents which we have reviewed. These supplemented a few pages that we acquired on our own. By letter dated November 12, 2010, the United States Attorney's Office provided us with additional documents relating to loss on the five properties that are the subject of this case. Part of the problem is that the documents supplied by the Government do not indicate which

LAW OFFICES OF
**STEWART P. RILEY**
800 FIFTH AVENUE • SUITE 4000
SEATTLE, WASHINGTON 98104
T (206) 622-0925 • F (206) 292-9736

financial institutions have been victimized and do not provide a basis for determining loss.  We will go through the five properties to give the Court our thoughts and calculations.

(a)     **170th Avenue Northeast, Woodinville.**   Government's stated loss—$192,000.  This property was purchased by Suzan Styer on January 10, 2007 for $650,000.  The property went into foreclosure and was sold on November 28, 2007 by Northwest Trustee Services to Deutsche Bank "at public auction to said Grantee, the highest bidder therefore, for the sum of $553,500 by the satisfaction in full of the obligation then secured by the Deed of Trust, together with all fees, costs and expenses...".  See Paragraph 10 of attached Trustee's Deed, Exhibit 1.  The obligation secured is stated in Paragraph 2 of the Deed as $520,000.  Undersigned counsel is no expert in interpreting these documents, but they seem to indicate to us that either there was no loss incurred on this residence by the original secured party, IndyMac, or the loss was limited to the difference between Styer's purchase price of $650,000 and the $553,500 paid by Deutsche Bank, which works out to $96,500.  Deutsche Bank later sold the residence on the open market for $458,000, but the loss on that sale does not appear to have anything to do with the fraud.

In addition, on November 11, 2010, the Los Angeles Times reported that four executives of the defunct IndyMac Bank are being sued by the FDIC for $300 Million based on loans granted that were unlikely to be repaid.  Is IndyMac a victim or a co-conspirator in the fraud committed in connection with this property?

DEFENDANT DICUGNO'S PRESENTENCE
MEMORANDUM
PAGE 2

1

2

(b)    **South 243rd Street, Kent.**   Government's estimate of loss—$75,000.  Of the five properties involved, this one may be unique we believe in that Countrywide Subprime, which bought the loan from Pierce Commercial Bank, was part of and privy to the fraud involved in this case.   One of Countrywide's employees, April Janus, was the underwriter and had an office located at PC Bank Home Loans, where Mr. Dicugno worked.  We realize that Ms. McLuen is probably not aware of this fact, but Ms. Janus was fully aware that fraud was going on in connection with this particular property and in connection with many of the loans done by PC Bank Home Loans by a number of different loan officers there.  Her involvement in the fraud should be confirmed by the United States Attorney's Office.  For this reason, no loss in connection with this property should be attributed to Mr. Dicugno for the purposes of either the guideline calculations or restitution.  See *U.S. v. Lazarenko*, No. 08-10185 (9th Cir., Opinion filed November 3, 2010) relating to restitution.

(c)    **Northeast 70th Street, Kirkland.**   Government's stated loss—$265,000.   The Government provided us with two Real Estate Excise Tax Affidavits in connection with this property, so we really don't have sufficient information to determine the accuracy of the indicated loss figure.

(d)    **North 88th Street, Seattle.**  Government's stated loss—$312,000.  Again, we have not been provided with sufficient information to determine the accuracy of the stated loss figure.

LAW OFFICES OF
**STEWART P. RILEY**
800 FIFTH AVENUE • SUITE 4000
SEATTLE, WASHINGTON 98104
T (206) 622-0925 • F (206) 292-9736

1         (e)    **167th Street Court East, Puyallup.**  Government's stated loss—

2  $318,867.  Again, we have not been provided with sufficient information to

3  determine the accuracy of the stated loss figure.

4         The bottom line is that, based on our review of documents in our possession and

5  documents provided to us by the Government, the amount of loss is less than the threshold of

6  $1,000,000 for a sixteen-level upward adjustment.  Though the Government appears to not

7  have the documentation necessary to prove a loss over $1,000,000 and may not even have the

8  documentation necessary to prove a loss over $400,000, we concede that the loss would fall

9  somewhere between $400,000 and $1,000,000 for guideline purposes.  Therefore, the upward

10  adjustment for loss should be fourteen levels.

11                                        **Minor Role**

12         Our only other real objection to the Probation Officer's Presentence Report is to the fact

13  that they did not give Mr. Dicugno a two-point downward adjustment for his minor role in the

14  conspiracy.  Having heard Mr. Dicugno's testimony in the trial of Mr. Ashmore, the Court is in

15  a particularly good position to assess whether or not Mr. Dicugno's role was minor.  The only

16  financial gain for him was his commissions for writing loans which he shared with PC Bank

17  Home Loans—sixty percent to Mr. Dicugno and forty percent to PC Bank Home Loans.  He

18  was not involved in the origination of the scheme.  The Government has already conceded to

19  me on several occasions that Mr. Dicugno was the least culpable of all four participants in the

20  conspiracy.  Clearly, he was substantially less culpable than Mr. Ashmore and less culpable

21  than Mr. Reimer and Mr. Nguyen.  For these reasons, Mr. Dicugno should be given a two-point

22  downward adjustment for his minor role in the offense.

LAW OFFICES OF
**STEWART P. RILEY**
800 FIFTH AVENUE • SUITE 4000
SEATTLE, WASHINGTON 98104
T (206) 622-0925 • F (206) 292-9736

1    If the Court determines the loss amount to fall between $400,000 and $1,000,000 and

2    gives Mr. Dicugno a minor role adjustment, his guideline range would be 21 to 27 months,

3    given Criminal History Category I.

## II

## RECOMENDATION OF DEFENDANT

6    It is our recommendation that the Court depart from the guideline range for the

7    following reasons and that the defendant be given a sentence of six months on electronic home

8    monitoring and required to put in five hundred hours of community service.

## III

## DEFENDANT'S COOPERATION TO DATE

11    Mr. Dicugno's cooperation has taken the following forms:

12        1.        Interview of him by the Government on January 25, 2008 when he

13    was represented by civil counsel without a proffer agreement.

14        2.        Proffer for over three and a half hours with Assistant United States

15    Attorney Lombardi and FBI Agent Joe Quinn on March 4, 2008.

16        3.        Letter dated March 12, 2008 by undersigned counsel to Mr.

17    Lombardi providing more information from Mr. Dicugno relevant to the

18    investigation.

19        4.        Letter dated May 13, 2008 by undersigned counsel to Mr.

20    Lombardi providing further information and documents from Mr. Dicugno

21    relevant to the investigation.

22

DEFENDANT DICUGNO'S PRESENTENCE
MEMORANDUM
PAGE 5

LAW OFFICES OF
**STEWART P. RILEY**
800 FIFTH AVENUE • SUITE 4000
SEATTLE, WASHINGTON 98104
T (206) 622-0925 • F (206) 292-9736

5.      Proffer with Mr. Lombardi, Agent Quinn, and Assistant United States Attorney Nicholas W. Brown on July 1, 2008 for approximately three hours.

6.      Proffer with Assistant United States Attorney Brian Werner, out of the Tacoma office, Ben Williamson (FBI), and Sylvia Reyes (IRS) on February 9, 2010 for over three hours.

7.      Letter dated February 7, 2010 by undersigned counsel to Mr. Werner providing further information from Mr. Dicugno relevant to the investigation of Pierce Commercial Bank employees in Tacoma.

8.      Proffer with Brian Werner, Agent Williamson, and Agent Reyes on August 2, 2010 for approximately two hours.

9.      On September 15 and 16, 2010, Mr. Dicugno testified for approximately two hours as a witness for the government in the trial of co-defendant Mark Ashmore before Your Honor.  Mr. Dicugno had met with the Government twice prior to trial in connection with preparing him to be a witness. Mr. Ashmore was convicted in part because of Mr. Dicugno's forthright testimony in that trial.   Assistant United States Attorney Brown advised undersigned counsel verbally on September 16, 2010 that Mr. Dicugno "did a great job" and was a "better witness than expected".

## IV

## DEFENDANT'S CONTINUING COOPERATION

LAW OFFICES OF
**STEWART P. RILEY**
800 FIFTH AVENUE • SUITE 4000
SEATTLE, WASHINGTON 98104
T (206) 622-0925 • F (206) 292-9736

As indicated above, Mr. Dicugno has been cooperating substantially with Assistant United States Attorney Werner in the Tacoma office in connection with the investigation of officers and employees of Pierce Commercial Bank and or its residential lending division, PC Bank Home Loans. This investigation grew out of Mr. Dicugno's three interviews by the Government in connection with the Ashmore conspiracy. In addition to providing background information and laying out for the Government clear back in 2008 how three of his superiors were engaging in widespread mortgage fraud, Mr. Dicugno has been able to provide the names of others at the bank and elsewhere who would corroborate the information initially provided by him. He has agreed to continue this cooperation and testify against his superiors and anyone else who engaged in mortgage fraud at the bank or in association with those at the bank. In a Complaint for Forfeiture In Rem of $102,000 in cash filed in United States District Court at Tacoma dated July 30, 2010, the Government has alleged that a Senior Vice President of PC Bank Home Loans was the originating loan officer from 2005 until July 2008 on approximately 5,253 loans, totaling more than $990 Million. According to the Complaint, "based on interviews and a review of financial records, the investigation has revealed that over fifty percent of these transactions were fraudulent". According to the Complaint, the investigation revealed that the Senior Vice President and two other principals (Mr. Dicugno's three superiors) at PC Bank Home Loans "had devised a scheme involving originating, processing and/or brokering mortgage applications with materially false representations to induce financial institutions to fund and/or purchase loans". This should give the Court some idea of the quality of the information that Mr. Dicugno provided the Government between 2008 and the present.

DEFENDANT DICUGNO'S PRESENCE
MEMORANDUM
PAGE 7

LAW OFFICES OF
**STEWART P. RILEY**
800 FIFTH AVENUE • SUITE 4000
SEATTLE, WASHINGTON 98104
T (206) 622-0925 • F (206) 292-9736

1    These three superiors set the tone for all of the other loan officers at the bank, including

2    Mr. Dicugno.  They relied to their detriment on these three superiors.  The tone at the bank set

3    by these three superiors was to do what it took to make the loan, even if that included

4    "falsifying borrowers' income, forging or doctoring supporting documents" according to the

5    Complaint.

6                                            **V**

7                    **SUBSTANTIAL ASSISTANCE TO AUTHORITIES**

8    We have no idea at this time whether the Government will file a Section 5K1.1 motion

9    to depart from the guidelines.  Such a motion is not as important in this case because there is no

10   mandatory minimum involved and the Court has a great deal of latitude as a result of *Booker*.

11   The Plea Agreement between Mr. Dicugno and the Government does not address the issue.

12   However, we are confident that the Government at the very least will verify the extent of Mr.

13   Dicugno's cooperation and substantial assistance.

14   It is clear to us that the defendant "has provided substantial assistance in the

15   investigation or prosecution" of others who have committed crimes and that a departure for that

16   reason or under the doctrine of "super acceptance of responsibility" is most appropriate.

17   The two most dramatic aspects of Mr. Dicugno's assistance are (1) his testimony at the

18   trial of Mark Ashmore, and (2) information he provided which led to exposure of massive fraud

19   occurring at Pierce Commercial Bank.  Though we believe that both of the other co-defendants

20   in this case also testified in the Ashmore trial, neither were in a position to provide information

21   regarding fraud at Pierce Commercial Bank.  As to Mr. Dicugno's testimony, this occurred

22   before Your Honor so that you are in a very good position to evaluate the significance and

LAW OFFICES OF
**STEWART P. RILEY**
800 FIFTH AVENUE • SUITE 4000
SEATTLE, WASHINGTON 98104
T (206) 622-0925 • F (206) 292-9736

1   usefulness of his assistance and the truthfulness, completeness, and reliability of his testimony.

2   See Section 5K1.1(a)(1) and (2).  A swift verdict of guilty was reached by the Jury in that case.

3       With respect to Mr. Dicugno's provision of information that led to the exposure of

4   massive fraud at Pierce Commercial Bank, this began in January of 2008, almost three years

5   ago.  It began at a time when the world was oblivious to the massive fraud that was occurring

6   throughout the banking industry—fraud that brought down Washington Mutual and tarnished

7   the reputation or brought down other major financial institutions including Wachovia,

8   Countrywide, IndyMac, etc.  Pierce Commercial Bank was also a victim of its own excesses.

9   That is to say, the provision of this information was very timely in spite of the fact that it has

10  taken so long to investigate and charge those above Mr. Dicugno at Pierce Commercial Bank—

11  those that set the tone for approximately twenty loan officers.  That tone was to make the loan

12  at all costs and here is how you do it.

13      The problem that we are facing at this point is that the result of Mr. Dicugno's

14  assistance to the Government with respect to his superiors at Pierce Commercial Bank will not

15  be totally known for a number of months.  It is anticipated that an indictment will be issued out

16  of this court in Tacoma as early as the end of this year.  It is anticipated that three or more

17  defendants will be charged, including the subject of the aforementioned Complaint for

18  Forfeiture In Rem of $102,000 in cash.  This Court has indicated its preference that Mr.

19  Dicugno's sentencing, scheduled for December 2, 2010, not be continued and that a Rule 35

20  motion could be made at a later time.  However, a Rule 35 motion can only be filed by the

21  Government.  There is no assurance that the Government would file such a motion.  It is not

22  part of the Plea Agreement.  Even if the Government was inclined to file such a motion, such a

DEFENDANT DICUGNO'S PRESENCENCE
MEMORANDUM
PAGE 9

LAW OFFICES OF
STEWART P. RILEY
800 FIFTH AVENUE • SUITE 4000
SEATTLE, WASHINGTON 98104
T (206) 622-0925 • F (206) 292-9736

1   motion might not become fully ready for filing until it is too late to help Mr. Dicugno in any

2   significant degree.

3          So it is our hope that the Court will look into the future and assume that Mr. Dicugno

4   will continue to cooperate with Assistant United States Attorney Werner in Tacoma and testify

5   completely and truthfully if necessary.  The best way to judge the future is by the past.  Judging

6   by Mr. Dicugno's past testimony in the Ashmore case, it is reasonable to assume that his

7   further cooperation in the case against others involved with Pierce Commercial Bank would be

8   complete and truthful.  Of course, it is possible that those charged may end up pleading guilty,

9   in part because of Mr. Dicugno's substantial cooperation to date.   This Court could add a

10  condition to Mr. Dicugno's sentence requiring his continued cooperation if the Court feels that

11  would be appropriate.

12         Our above comments have support in the "Background" section of Section 5K1.1

13  which states as follows:

14         Background:   A defendant's assistance to authorities in the
       investigation of criminal activities has been recognized in practice
15     and by statute as a mitigating sentencing factor. The nature, extent,
       and significance of assistance can involve a broad spectrum of
16     conduct that must be evaluated by the court on an individual basis.
       Latitude is, therefore, afforded the sentencing judge to reduce a
17     sentence based upon variable relevant factors, including those
       listed above…

18

19                                        VI

20                   CULTURE AT PC BANK HOME LOANS

21         To give the Court some idea of the culture at PC Bank Home Loans, we turn to the

22  many local investigative reports regarding the collapse of Washington Mutual here in Seattle as

DEFENDANT DICUGNO'S PRESENTENCE
MEMORANDUM
PAGE 10

LAW OFFICES OF
STEWART P. RILEY
800 FIFTH AVENUE • SUITE 4000
SEATTLE, WASHINGTON 98104
T (206) 622-0925 • F (206) 292-9736

an example of the pervasive fraud that was going on in the industry.  On April 13, 2010 the

Seattle Times reported that at one office, "58 percent of loans examined in an internal review

were fraudulent; at another it was 83 percent."  Former longtime, Washington Mutual CFO

Mark Longbrake was quoted in the November 4, 2008 Seattle Times as follows:

> The whole market accepted "stated income," and there were quips
> about those being liars' loans, but everyone did it.  Nobody was
> paying attention.  WaMu's great sin was following the herd and
> doing what the rest of the market was doing.

The December 28, 2008 issue of the Seattle Times quoted Steven Knobel, a founder of

an appraisal company that did business with Washington Mutual until 2007, as follows:

> It was the Wild West.  If you were alive, they would give you a
> loan.  Actually, I think if you were dead, they would still give you
> a loan.

By 2005, the word was out that Washington Mutual would accept applications with a

mere statement of the borrower's income and assets—often with no documentation—so long as

credit scores were adequate, according to underwriters.  It was all about saying yes.  To our

knowledge, no one locally with Washington Mutual has been charged with illegal activities

relating to widespread mortgage fraud at that institution.  Like Washington Mutual, fraud at PC

Bank Home Loans had become a way of life before Mr. Dicugno began his employment there.

When Mr. Dicugno went to work as a loan officer at PC Bank Home Loans, he did so at the

behest of the Senior Vice President referred to above who is currently under investigation.  The

Senior Vice President knew Mr. Dicugno from college days.  Mr. Dicugno had no experience

in the financial industry.  He had graduated form Pacific Lutheran University with a Bachelor

of Science degree.  Prior to going to work at PC Bank Home Loans he had been a middle

DEFENDANT DICUGNO'S PRESENTENCE
MEMORANDUM
PAGE 11

LAW OFFICES OF
STEWART P. RILEY
800 FIFTH AVENUE • SUITE 4000
SEATTLE, WASHINGTON 98104
T (206) 622-0925 • F (206) 292-9736

school and high school teacher and coach. He was naïve. A real estate frenzy was underway in

Western Washington as well as most of the United States. When he questioned ways to get a

loan processed, his superiors told him how to proceed. He should have known better. Clearly

he is intelligent enough to have known better. To his credit, he eventually voluntarily decided

to leave the bank. Unfortunately, he has become somewhat of a scapegoat for all the other loan

officers at PC Bank Home Loans, who also followed the direction of their superiors.

## VII

## WITHDRAWAL FROM CONSPIRACY

In mid-December 2007, Mr. Dicugno submitted a letter of resignation to his three

superiors. They were all, including Mr. Dicugno, aware that the bank had apparently been

served with a grand jury subpoena relating to the Ashmore investigation. His superiors wanted

him to stay and be part of their team. Chris was advised that he would be protected and that

Pierce would stand behind him and pay for an attorney to represent him in the investigation,

which they all believed was in process because of the subpoena. Mr. Dicugno, however, had

had enough. He did not want to continue the course of misrepresentation in which he had been

involved. He wanted no part of a cover-up. He had nowhere to go, but was through

compromising his values. He stopped doing business with Ashmore. He turned down his

superiors' entreaties and, when he was contacted by the authorities in late January 2008, he

hired a civil lawyer to represent him and paid for that representation out of his own pocket.

Though Mr. Dicugno was aware of an apparent grand jury subpoena issued to the bank,

he deserves some credit for getting out earlier than the others. We believe that he was the first

of those charged in the Ashmore indictment to get out. We believe that the other three did not

DEFENDANT DICUGNO'S PRESENTENCE
MEMORANDUM
PAGE 12

LAW OFFICES OF
STEWART P. RILEY
800 FIFTH AVENUE • SUITE 4000
SEATTLE, WASHINGTON 98104
T (206) 622-0925 • F (206) 292-9736

cease their illegal activities until contacted by the authorities. The indictment in this case refers to the conspiracy extending through January 12, 2008, approximately a month after Mr. Dicugno resigned. In addition, he left his position at the bank long before any of his three superiors at the bank.

Withdrawing from a conspiracy is a circumstance that distinguishes Mr. Dicugno's conduct not only from all of his co-defendants, but from the vast majority of all defendants convicted in Federal Court. See *Gall v. United States,* 128 S. Ct. 586, 552 U.S. 38 (2007) at 18. The United States Supreme Court in *Gall* approved of the District Court's treatment of Mr. Gall differently from other conspirators who did not voluntarily withdraw from the conspiracy. The Court stated that the voluntary withdrawal by Gall "lends strong support to the District Court's conclusion that Gall is not going to return to criminal behavior and is not a danger to society. See 18 USC § 3553(a)(2)(B), (C)." Clearly Mr. Dicugno's withdrawal from the conspiracy in this case as in *Gall* is an indication that Mr. Dicugno is unlikely to return to criminal behavior and is not a danger to society. That is also buttressed by the fact that Mr. Dicugno has lived a sterling life since his withdrawal from the conspiracy in December 2007, a period of three years.

## VIII

## CONCLUSION

We have attached six letters (one from Mr. Dicugno—Exhibit 2) which should give the Court some idea that Mr. Dicugno has rehabilitated himself since the dreary day in December 2007 when he recognized the depth to which he had fallen. He is currently a stay-at-home dad caring for three children (ages 4, 5, and 7) while his wife brings home the bacon. He is anxious

DEFENDANT DICUGNO'S PRESENTENCE
MEMORANDUM
PAGE 13

LAW OFFICES OF
**STEWART P. RILEY**
800 FIFTH AVENUE • SUITE 4000
SEATTLE, WASHINGTON 98104
T (206) 622-0925 • F (206) 292-9736

to get back to the work-a-day world.  He has no prior convictions.  There would be no further deterrent effect to incarcerating him at this point.  His moral compass has already been readjusted.

Mr. Dicugno is intelligent, personable, and ambitious—just the type of individual who could have a dramatic impact on his community through community service geared toward his experience in coaching, teaching, and working within his own church.  Requiring him to engage in community service would be a constant reminder to him of his transgression, which from all indications was totally aberrant.

In short, we believe that our recommendation provides a perfect solution to Mr. Dicugno's long journey—a sentence sufficient, but not greater than necessary to carry out the purposes of sentencing.

DATED this 19th day of November, 2010.

Respectfully submitted:

/s/ Stewart P. Riley

Stewart P. Riley WSBA#3779
Attorney for Christopher Dicugno
800 Fifth Avenue, Suite 4000
Seattle, Washington  98104
*Phone* (206) 622-0925
*Fax* (206) 292-9736
*Email* stewriley@yahoo.com

DEFENDANT DICUGNO'S PRESENTENCE
MEMORANDUM
PAGE 14

After Recording Return To:
Post Sale Dept.
Northwest Trustee Services, Inc.
P.O. Box 997
Bellevue, WA 98009-0997



**200711300002841**
FIRST AMERICAN TD
PAGE001 OF 002          41.00
11/30/2007 16:02
KING COUNTY, WA

File No.: 7523.20352/Styer, Suzan V.
1009184530

3373514

## Trustee's Deed

1ST AM ②/4/

The GRANTOR, Northwest Trustee Services, Inc., as present Trustee under that Deed of Trust (defined below), in consideration of the premises and payment recited below, hereby grants and conveys, without representation or warranty, expressed or implied, to Deutsche Bank National Trust Company as Trustee under the Pooling and Servicing Agreement Series INDX 2007-AR5, as GRANTEE, all real property (the Property), situated in the County of King, State of Washington, described as follows:

Tax Parcel No.: 012605-9268-02

Lot(s) 2 of King County Short Plat No. 884026 recorded under Recording No. 8602180804, Records of King County, Washington. Situate in the County of King, State of Washington.

RECITALS:

1. This conveyance is made pursuant to the powers, including the power of sale, conferred upon the Grantee by that certain Deed of Trust between Suzan V. Styer, an unmarried woman, as Grantor, to Old Republic Title, Ltd., as Trustee, and Mortgage Electronic Registration Systems, Inc. solely as nominee for Lender and Lender's successors and assigns, Beneficiary, dated 01/05/07, recorded 01/12/07, under Auditor's/Recorder's No. 20070112001782, records of King County, Washington and subsequently assigned to Deutsche Bank National Trust Company as Trustee under the Pooling and Servicing Agreement Series INDX 2007-AR5 under King County Auditor's/Recorder's No. 20070817002262.

2. The Deed of Trust was executed to secure, together with other undertakings, the payment of one or more promissory note(s) ("Note") in the sum of $520,000.00 with interest thereon, according to the terms thereof, in favor of Mortgage Electronic Registration Systems, Inc. solely as nominee for Lender and Lender's successors and assigns and to secure any other sums of money which might become due and payable under the terms of said Deed of Trust.

3. The Deed of Trust provided that the Property is not used principally for agricultural or farming purposes and the Grantor has no actual knowledge that the Property is used principally for agricultural or farming purposes.

4. Default having occurred in the obligations secured and/or covenants of the Deed of Trust grantor, as set forth in Notice of Trustee's Sale described below, which by the terms of the Deed of Trust make operative the power to sell, the thirty-day advance Notice of Default was transmitted to the Deed of Trust grantor, or his successor in interest, and a copy of said Notice was posted or served in accordance with law.

5. Deutsche Bank National Trust Company as Trustee under the Pooling and Servicing Agreement Series INDX 2007-AR5, being then the holder or the nominee of the indebtedness secured by the Deed of Trust, delivered to said Grantor a written request directing Grantor to sell the Property in accordance with law and the terms of the Deed of Trust.

**E2322822**
11/30/2007 16:01
KING COUNTY, WA
TAX                    $10.00
SALE                   $0.00       PAGE001 OF 001   **EXHIBIT 1**

6. The defaults specified in the "Notice of Default" not having been cured, the Grantor, in compliance with the terms of the Deed of Trust, executed and on 08/22/07, recorded in the office of the Auditor of King County, Washington, a "Notice of Trustee's Sale" of the Property under Auditor's File No. 20070822001070.

7. The Grantor, in the "Notice of Trustee's Sale", fixed the place of sale as outside adjacent to the south entrance to 3535 Factoria Blvd SE,, City of Bellevue, State of Washington a public place, at 10:00 o'clock a.m., and in accordance with the law caused copies of the statutory "Notice of Trustee's Sale" to be transmitted by mail to all persons entitled thereto and either posted or served prior to 90 days before the sale; further, the Grantor caused a copy of said "Notice of Trustee's Sale" to be published in a legal newspaper in each county in which the property or any part thereof is situated, once between the thirty-fifth and twenty-eighth day before the date of sale, and once between the fourteenth and the seventh day before the date of sale; and further, included with the Notice, which was transmitted to or served upon the Deed of Trust grantor or his successor in interest, a "Notice of Foreclosure" in substantially the statutory form, to which copies of the Note and Deed of Trust were attached.

8. During foreclosure, no action by the Beneficiary, its successors or assigns was pending on an obligation secured by the Deed of Trust.

9. All legal requirements and all provisions of said Deed of Trust have been complied with, as to acts to be performed and notices to be given, as provided in chapter 61.24 RCW.

10. The defaults specified in the "Notice of Trustee's Sale" not having been cured ten days prior to the date of Trustee's Sale and said obligation secured by said Deed of Trust remaining unpaid, on 11/26/07, the date of sale, which was not less than 190 days from the date of default in the obligation secured, the Grantor then and there sold the Property at public auction to said Grantee, the highest bidder therefore, for the sum of $553,500.00 to the satisfaction in full of the obligation then secured by the Deed of Trust, together with all fees, costs and expenses as provided by statute.

This conveyance is made without representations or warranties of any kind, expressed or implied. By recording this Trustee's Deed, Grantee understands, acknowledges and agrees that the Property was purchased in the context of a foreclosure, that the trustee made no representations to Grantee concerning the Property and that the trustee owed no duty to make disclosures to Grantee concerning the Property, Grantee relying solely upon his/her/their/its own due diligence investigation before electing to bid for the Property.

DATED: November 28, 2007

GRANTOR
Northwest Trustee Services, Inc.

By _____
Assistant Vice President
Northwest Trustee Services, Inc. is successor by merger to Northwest Trustee Services, PLLC (formerly known as Northwest Trustee Services, LLC)

STATE OF WASHINGTON     )
                        ) ss.
COUNTY OF KING          )

I certify that I know or have satisfactory evidence that **Jeff Stenman** is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged (he/she) as the Assistant Vice President of Northwest Trustee Services, Inc. to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: __11/28/07__

JULIE BOUFFLEUR
STATE OF WASHINGTON
NOTARY — • — PUBLIC
MY COMMISSION EXPIRES  02-23-09

_____
NOTARY PUBLIC in and for the State of
Washington, residing at Seattle
My commission expires: 02/23/2009

To the Honorable Judge Richard A. Jones,

Thank you for taking the time to read this letter. I am writing to you in regards to my upcoming sentencing on December 2, 2010. The intent of my writing to you is to express my deep regret, remorse and sorrow for my actions which I committed three and one half years ago. I truly appreciate the opportunity to tell you that I am sorry for all of the actions that I did and did not do that have led me to be before you now.

When I initially set out on the career path of originating loans I knew that I would be tempted by greed and success. I was correct; I was tested. Regrettably, I failed this test of my moral character. In my arrogance I thought I was influencing others, but I was the one who was influenced. In my ignorance I did not see how much I had changed myself.

I regret so many of the decisions that I made, I hardly know where to begin. I regret ever leaving my teaching and coaching job to run after wealth. I was a good teacher and coach and I was impactful in the lives of the students I taught. I should have been content with this career. I am faced with the stark reality that I will never be a public school teacher again.

I regret the decisions that led me to work where I did and how I allowed myself to be influenced by those I worked with there. I impulsively began working in the banking industry without proper training or education. I had a choice to do otherwise. I regret the lack of care, professionalism, wisdom and courage that I exhibited in my business dealings.

I regret the risks I took with my family's money when investing with Mark Ashmore. It was my greed that drove me to first invest with Mark Ashmore and it was my desperation and ignorance that caused me to become further involved with him. I regret that I went against my moral standards when my conscience was clearly telling me not to do so. I am deeply saddened by the hypocrisy of my actions.

I am also grieved by the fact that I was not more honest, clear thinking and cooperative with this investigation from the outset. I wish I had come to terms with my involvement and role sooner. It was in my naivety and confusion that I minimized my role. I desired to protect my former coworkers and myself, but I ultimately caused myself and my family further harm.

I too was deceived to think that my actions were normal and commonplace. I was in an environment where a different set of rules and standards seemed to apply. However, I humbly accept the fact that I chose to believe these standards. I believed what I wanted to believe and in so doing deceived myself.

My family and I are desperately trying to start over. Our attempt to do so began almost three years ago when I resigned from my position as the branch manager to which I was recently

**EXHIBIT ___2___**

assigned by my three superiors. I left a lucrative salary and promises of legal protection. I started to work at a couple of new places but I left rather than risk the possibility of bringing a bad light to the firm. I desired to be completely open and honest about the investigation with any future employer. This coupled with the fact that we needed a stable income drove my wife and I to decide to have her work full time and that I would stay at home and be the primary caregiver for our three children. My time with them has been precious and healing and I am grateful for it. I have been able to see our oldest daughter Claire (age 7) excel in school and teach both our son Levi (age 4) and our daughter Anna (age 5) how to read.

In addition to my wife working, we set out to sell all that we could to compensate for our reduced income, legal fees and financial losses to Mark Ashmore. Over the last three years we have sold our personal home and three of our rental properties. Three of these properties had negative equity. Therefore we cashed in what was left of our retirement account and refinanced our cars to pay off the underlying liens at closing.

On a regular basis my wife works extra shifts and I do handyman work for extra income. We still own three rental properties all of which have negative equity. Additionally, the rent does not cover the monthly mortgage payments. So every month we pay out of pocket to keep our loans current. Compounding this loss has been the fact that my business partner has not been able to keep up with his payments to the company which holds the titles to these three properties.

Many have recommended that we short-sell or let the properties be foreclosed on by the banks. This is not our desire. We want to keep them (even though they are completely upside down) and make an attempt to pay the loans back. I do not judge anyone who has let their properties go or have short-sold them; however we want to avoid this if at all possible.

In an effort to restore my relationship with my community I have been volunteering at my church on a consistent basis. We have served the homeless community and have volunteered for miscellaneous jobs to assist the elderly in our congregation. I was also privileged to serve on a mission trip to Mexico two years ago. I hesitate to share these activities as they may seem an attempt to put forth an image or appearance of myself that is drastically different than my heart. But I feel it is worth the time and effort to explain the step that I have already taken that will help lead me to be the man who I truly want to become. I pray that you would trust me and my letters of character on this.

I have been willing, available and eager to meet with law enforcement in regard to giving testimony or providing any information I may have. Obviously my efforts are not altogether

altruistic. But I desire to be truthful and honest, helpful and cooperative, and will do so even if it does nothing to help my own situation. Of course I would like it to bode well for me and my family. But I believe by faith that my honesty will be rewarded in and of itself.

My family and I have lived with this uncertainty, shame and sadness for three and one half years. It has been a dreadful cloud over our lives. We are eager to start this new chapter with full knowledge that there will be much more pain involved. I hope that this letter does not communicate a desire on my part to explain my actions and be excused as I believe there is ultimately no excuse for the immoral decisions we make. However I am asking for forgiveness and mercy. I beg for mercy not simply for me alone, but for my wife and my small children. We want to make things right, as much as we can, and we have a great community of friends and family who are willing to help us. We want to pay back the loans we still owe and to pay back whatever restitution the court decides. And we want to do so in a timely manner. We are willing to work in doing so.

Thank you for taking time to read this letter.

Sincerely,

Chris DiCugno

September 9, 2010

To Whom it May Concern:

The following is a letter of reference for Chris Dicugno.

I first met Chris in 1998. We were colleagues in a youth organization together and saw each other frequently at meetings and training sessions. I always looked forward to his company and appreciated his rugged determinism and honesty to seek the truth of the matter in all things. Chris and I have grown particularly close over the past three years as I have had the honor of serving as his pastor as well as being a close friend of his. I consider Chris to be one of my closest friends because he is one of the few people that I know that are willing to have a conversation based on honesty and substance.

One of the most striking character traits about Chris is his commitment to act in full integrity and disclosure. He is willing to confront life squarely without giving in to fear. Chris is a 'by the book' sort of guy. He routinely invites my constructive critique and assessment of his decisions and plans. Chris wears his conscience on his sleeve and he takes responsibility for his actions. He weighs all the facts and assesses situations and opportunities from all angles to ensure that things are legitimate and upstanding. When I have seen Chris make a mistake, he does not hide it; but rather confesses it openly and visibly learns from it.

I have watched Chris honestly confront and wrestle with the charges that have been brought before him. I can say without a shadow of a doubt that these charges are extremely out of character for him. I have routinely seen him reject selfish gain in favor of a life of integrity. He has replayed the events numerous times with me; searching for signs that he might have missed that would have indicated the danger he was walking into. I have never known Chris to act against his conscience. Any illegal activity would be completely out of character for him.

It has been incredible watching Chris as a stay-at-home dad these past three years. He is a faithful and devoted husband to his wife, Sarah. His children are his pride and joy and the three of them adore their father immensely. In addition to serving his family, I have heard Chris on numerous occasions express his growing desire to be more active in serving his community. In short, Chris does not live for himself. His delight is in loving and serving his family and pursuing the Lord's call in his life to minister to those around him.

Sincerely,

Jeremy McKim
Pastor, The Cross
www.westseattlecross.com
8614 32nd Ave SW
Seattle, WA 98126
425.766.1477
jeremy@westseattlecross.com

**EXHIBIT** _3_

September 8, 2010

To Whom It May Concern,

It is my pleasure to write in reference to the character of Chris DiCugno. I have known Chris for 24 years as a teammate, friend, and co-worker. You will not find a more hard-working, disciplined, kind, and dedicated person than Chris.

Chris and I competed on the same wrestling team in junior high, high school, and college. I have uniquely observed and walked with Chris in the midst of highs, lows, victory, defeat, joys, and pains. Chris was always an inspiration to his teammates, both verbally and in action, despite the circumstances. A sense of humor mixed with phenomenal work ethic made the rigors of athletics enjoyable and successful not only for himself but his teammates as well.

As a friend I have been able to witness Chris as a father and husband. It is obvious his three children both love being with him and respect him as an authority figure. He is gentle, self-controlled, and temperate. Additionally, Chris is a servant to his wife and is an example of how a man should treat a woman with respect and honor.

Furthermore, it was a pleasure to have coached on the same staff with Chris for a number of years. Chris has a gift to teach, gain respect from athletes, and inspire people to excellence. Many young men benefited from Chris's integrity in the mentoring and coaching relationship that he had with them.

The behavior of Chris DiCugno that brings him before the court does not match the record of his life in school, work, family, or friendships. His character and leadership throughout all areas of his life show him to be a productive citizen that betters those people with whom he comes in contact.

Please strongly consider the positive character traits of Chris DiCugno throughout this litigation. If you have any questions, please do not hesitate to contact me.

Sincerely,

Brian Peterson
Executive Director
253-569-4149
bpeterson@realitysports.org

**REALITY SPORTS FOUNDATION** • PO Box 2192 • Sumner, WA 98390
Office: 116 23rd St SE • Puyallup, WA 98372 • [ Phone ] 253.370.0966
email: office@realitysports.org • www.realitysports.org

EXHIBIT ___4___

September 7, 2010

RE: Chris Dicugno
From: Paul Johnson
8318 230th Ave Ct E
Buckley, WA 98321
(253) 261-6894

To Whom It May Concern,

I have known Chris for two solid years. I am proud to say that I consider Chris a close friend of mine. I don't believe it's the length of time you know a person, but rather the difference they make in the amount of time you know them. Chris has impacted my life without even being aware of it. Me and Chris met through a church program our church puts on called Freezing Nights. Freezing Nights is intended to bring the homeless off the streets for the night, when the weather reaches a freezing temperature. We provide them a meal, a warm bed and essentials as needed. The program is a great idea, however it was difficult to find men that were willing to sacrifice their Monday nights and come and serve the homeless. We had numerous volunteers to serve meals, or provide items as needed, but rarely would anyone sleep over. Chris gladly stepped up for the position without complaint. These men and women truly lived on the streets. No showers, no hygiene, and at times the smell is unbearable. Not many can look past that and see the person behind the alcohol and dirt. From the day I met Chris, he has always approached the homeless with kindness and respect. He has never been anything less than a friend to them. I have seen them confide in him as he shared his stories with them and gave them a reason to continue on.

I had no idea what difficulties Chris was facing in his personal life. He never let it affect his compassion towards our friends. His faith is strong and hard and he shines through to others and gives them hope. As the economy turned, I found myself in a very difficult position with losing my job, selling my home for less than what I owed and really struggling on a day to day basis. I always looked forward to seeing Chris on Monday nights because I knew talking to him would ease my mind. He has made my faith stronger, and helped me to grow as a man. It wasn't until Chris thought he was in jeopardy of losing his position with Freezing Nights that he told me the details of his life. I have to say I was stunned, but I also know that a man with his heart and intentions would not deliberately harm anyone. He confided in me the shame he lives with every day and how he would gladly give up any material items to be able to stay with his family. Regardless of what the courts decision is, Chris will never forgive himself for what has happened. It will be with him for the rest of his life.

My wife is a Realtor and we have discussed the entire ordeal. I know it doesn't make it right, but seeing how the market was going and as quickly as it was moving along, it was very difficult not to get caught up in it on some level. Laws were broke and lives were hurt, this is a fact. However, I believe everyone deserves one second chance. While I think every action has a consequence I think it would be harmful for Chris to serve jail time. He has so much to offer our community and he would be truly missed. He is an integral part of our church, and our lives. He is a man that will do anything for his family, and he loves his children with all his heart. Not only would Chris be being punished, but so would his children, his wife and our entire community. Chris has been living a honest, loving life the past few years I have known him.

As a police officer, I see so many people out there that are in need of jail time and get away with a slap on the wrist. I also see over crowded jails and too much money spent on inmates. It would not serve any purpose to put Chris in jail. His lesson has been learned, and it is my prayer that there is another solution to his situation. It would be very difficult for me to run freezing Nights without Chris this year and he would be greatly missed by the homeless that have come to count on him for comfort.

**EXHIBIT** _5_

As I close this letter, I ask that you please consider who Chris is now, more than what Chris has done in the past. As I stated before, he is a very valuable team player in our Freezing Nights program and I would hate to lose him. He is also the stay at home Dad that cares for his family greatly. It would put a great hardship on his family for him to be taken away. I can't express how much respect I have for Chris for pulling his life together and trying to push forward.

Sincerely,

Paul B. Johnson

September 26, 2010


To Whom It May Concern:


I am writing this letter on behalf of Chris Dicugno, a defendant in a criminal lawsuit. I have known Chris for 10 years. He is the husband of one of my close co-workers. I am a Pediatrician and the Medical Director of a large private medical office in Pierce County. His wife is a Nurse Practitioner in our office. During this last decade I have come to know Chris well and was completely surprised to learn of the allegations and lawsuit against him.

Chris Dicugno is one of the kindest, most honest and sincere people that I know. When I met Chris he was a teacher and a wrestling coach. Eventually, he felt called to try something else and was encouraged to go into the mortgage business. Being new to the business he was quickly taken under the wing of his superiors and taught the business by those whom we now know to have engaged in illegal activities and methods. Chris is extremely hard-working and dedicated to whatever he does.

We all know people in our lives that are there to make a difference and to try and make the world a better place. I truly believe that Chris is one of those people. He gives of himself freely to those he calls friends and those in need. He is a good Christian and lives by these beliefs. I have many friends and acquaintances, but there are not many who possess the moral character and virtue that Chris does.

He is a wonderful father to his three children. My profession certainly exposes me to all types of parents and styles of child rearing. I see some of the best and worst in people and how they raise their children and guide their families. Chris has spent the last several years as a stay at home dad caring for his children and the household. This job is one of the hardest jobs in the world, and one that I myself fear I would be inadequate at. Yet Chris has flourished in this role and continues to raise one of the most grounded, caring and cohesive families that I know.

While I certainly do not know the details and extent of the allegations against Chris, I am quite certain that much of the wrongdoing was perpetrated by those in authority over him and those who taught him what he was to do. I know how hard this has been for Chris to see how his faith can be tested, his life put on hold and how he played a part in this case. I am certain that Chris did not willingly and knowingly commit any illegal activity, but unfortunately was part of a scheme created by those who did.

Chris has been open, honest and forthright in helping with this investigation and providing any information that he has to help bring those at fault to justice. I hope that you take these things into consideration when deciding the fate of this man and his family. Chris is not a man who deserves to be put in jail for something like this. He has accepted his part in this and should be allowed to continue being a responsible and productive member of society. I believe in the goodness and integrity of Chris and would trust him to care for my own family.

**EXHIBIT** _6_

I look forward to the end of this case and hope that this information will guide you to understand the true nature of Chris Dicugno. I pray that justice will be served to those responsible for crimes in accordance with their true involvement and intent to commit such offences.


Thank you for your time and dedication to justice.


Sincerely,

Brian Schoos, MD

906 23rd Ave SW

Puyallup, WA 98371

MENTORING LEADERS THROUGH GODLY PRINCIPLES

Northwest Network Foundation

P.O. BOX 158  PUYALLUP, WASHINGTON 98371
NORTHWEST NETWORK FOUNDATION IS A 501 (3) NON PROFIT ORGANIZATION

September 28, 2010

To Whom it May Concern:

I consider it both an honor and a privilege to be asked to write this letter on behalf
of Chris DiCugno. I have known Chris for over 15 years as a mentor and as a friend. I
have observed him as a friend to many, a teacher to the young, and as a father and a
husband.

As a friend he exhibits integrity, faithfulness, and consistency.  He understands the
value of relationships and the importance of community in the well being of his
family and the overall balance it brings to the individual. Chris is someone who
looks after the higher good in others and longs to follow what is true. He is someone
who can be counted on no matter the situation.

As a teacher he sees the necessity to communicate truth in clear, concise ways that
lead others to excellence. Whether in the classroom, boardroom, or in an athletic
context, Chris takes seriously the things he models and the words he speaks. Chris
knows that teachers, coaches, and businessmen wield great influence and, therefore,
believes that his life examples can give hope to the one or destroy that same one's
dreams.  He has exemplified encouragement, strength of character, and selfless love
through these afore mentioned roles.

As a father and husband Chris see no greater calling on his life than to love and
serve his wife and to love and instruct his children with solid values that will be
anchors in their lives. Chris is decisive, wise, and courageous in leading his family.

Fortunately, the unfortunate circumstances that have necessitated this letter are
inconsistent with who Chris DiCugno is. Throughout my life experiences I have
found that it is not our mistakes, failures, or unwise choices that define us, but
rather how we respond to them. I could not be more proud to call Chris my friend
then in this present moment as I have watched him respond to this situation. He has
been honest and real and repentful and taken ownership. He has been responsible
and resilient.

EXHIBIT ___7___

MENTORING LEADERS THROUGH GODLY PRINCIPLES

Northwest Network Foundation

P.O. BOX 158  PUYALLUP, WASHINGTON 98371
NORTHWEST NETWORK FOUNDATION IS A 501(c)3 NON PROFIT ORGANIZATION

I would ask that in this necessary process you would be mindful of all that Chris has contributed to so many and that he, ironically, has chosen to be a man of integrity in moving forward in this process.

Sincerely,

Steven R. Ridgway
Executive Director; The Northwest Network Foundation
253-435-1344
riva51@comcast.net